# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IRENE KAMPANIS, on behalf of herself and all others similarly situated, <br><br>                    Plaintiff, <br><br>     v. <br><br> ENDO PHARMACEUTICALS INC.; TEIKOKU PHARMA USA, INC.; TEIKOKU SEIYAKU CO. LTD.; ACTAVIS, INC.; WATSON PHARMACEUTICALS, INC.; WATSON LABORATORIES, INC.; ANDA, INC.; ANDA PHARMACEUTICALS, INC.; AND VALMED PHARMACEUTICALS, INC. <br><br>                 Defendants. | Civil Action No.: <br><br> **CLASS ACTION** <br><br> **JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Irene Kampanis ("Plaintiff"), on behalf of herself and all others similarly situated, for this Class Action Complaint ("Complaint") against Defendants Endo Pharmaceuticals, Inc., Teikoku Pharma USA, Inc., and Teikoku Seiyaku Co., Ltd. (collectively, "Endo"), and Actavis, Inc., Watson Pharmaceuticals, Inc., Watson Laboratories, Inc., Anda, Inc., Anda Pharmaceuticals, Inc., and Valmed Pharmaceuticals, Inc. (collectively, "Actavis" and with Endo, "Defendants"), alleges the following based on: (a) personal knowledge; (b) the investigation of Plaintiff's counsel; and (c) information and belief:

## I.   NATURE OF THE ACTION

1.      Plaintiff brings this class action on behalf of itself and a class of consumers who purchased, reimbursed or otherwise paid for the lidocaine patch, 5% ("lidocaine patch") that Endo sold under the name "Lidoderm."  Lidoderm is a pain patch that delivers the drug lidocaine subcutaneously for the treatment of pain associated with post-herpetic neuralgia. Plaintiff alleges that Defendants violated antitrust laws through an overarching anticompetitive scheme to delay illegally the entry onto the market of a less-expensive, generic Lidoderm.  Plaintiff seeks both damages, an order enjoining Defendants' anticompetitive conduct, and other relief.

2.      The Food and Drug Administration ("FDA") approved New Drug Application ("NDA") 020-612 for Lidoderm on March 19, 1999. Since then, Endo has enjoyed a monopoly on Lidoderm sales, charging monopolistic prices and reaping outsized profits that it would not otherwise have achieved with a generic equivalent on the market. Indeed, Endo posted net U.S. sales of Lidoderm of approximately $950 million. Generic versions of brand-name drugs such as Lidoderm, however, are typically far less expensive than their brand-name counterparts.  Purchasers, prescribers, and pharmacies quickly adjust to the availability of a generic equivalent to a brand name product such as Lidoderm.  As such, the availability on the market of a generic equivalent of Lidoderm would have disabled Endo from charging supra-competitive prices for Lidoderm.

3.      On or about November 13, 2009, Actavis filed an Abbreviated New Drug Application ("ANDA") with the FDA, seeing approval to manufacture and sell a generic equivalent to Lidoderm. By filing this first Lidoderm-related ANDA, Actavis became eligible exclusively to sell its generic version for 180 days save only for the right of Endo to sell its own

generic equivalent known in the industry as an "authorized generic." An authorized generic is simply the brand product sold under generic trade dress at a cheaper price than the brand. Although Actavis' 180-day exclusivity period gave it the highly lucrative ability to sell generic Lidoderm without competition from other generic manufacturers seeking to market their own generic equivalents, Endo's right to sell its own generic, a common strategy in the pharmaceutical industry, would have significantly reduced Actavis's profits during its 180 day period of exclusivity.

4.     This ANDA threatened to end Endo's monopoly on Lidoderm and the outsized profits it reaped as a result.  Shortly thereafter, therefore, Endo sued Actavis, alleging that Actavis infringed U.S. Patent No. 5,827,529 ("the '529 patent") its patent for Lidoderm. Actavis parried Endo's claims, asserting, among other defenses, that inequitable conduct seriously undermined the validity of the '529 patent. The success of the challenge of Actavis to the validity of the '529 patent would have both lowered the price of Lidoderm materially and prompted other generic manufacturers to compete for market-share of the lidocaine patch, 5% – including, but not limited, potentially to Endo's own, less expensive "authorized generic."

5.     To avoid this loss of monopoly power, Endo sought to settle its patent litigation with Actavis. Ultimately, on May 28, 2012, Endo and Actavis agreed to the following "Brand Product Supply" provision (the "Agreement"): (a) Actavis would drop its challenge to the Lidoderm patents and delay until September 15, 2013 selling a less expensive generic equivalent product, in exchange for (b) Endo's promise to provide Actavis a free supply of branded Lidoderm that Actavis could re-sell at surpacompetitive prices. These re-sales amounted to at least $96 million and potentially up to $240 million of Lidoderm sales. Providing free product for resale was the equivalent of a cash payment directly to Actavis.  By the Agreement,

3

therefore, Endo and Actavis unlawfully shared monopoly profits.

6.      In addition to the blatant payment to avoid competition, Endo further agreed not to compete with Actavis in the generic equivalent market. That is, once Actavis came to market with its generic equivalent Lidoderm, Endo agreed not to begin selling its own generic equivalent during the 180 day exclusivity Actavis achieved by first-filing its ANDA. Thus, Actavis obtained a second, large financial inducement to delay its launch of generic Lidoderm in the form of Endo's illegal agreement to refrain from launching a competing authorized generic until seven and one-half months after Actavis' generic Lidoderm product was on the market.

7.      The Federal Trade Commission ("FTC") and other government entities recognize that the availability of authorized generic equivalents significantly benefits pharmaceutical purchasers. As choice increases, so too does price competition which reduces generic prices during the first 180 days. By agreeing to not exercise its lawful right to launch an authorized generic until seven and a half months after Actavis' launch, Endo was agreeing to restrain or limit its ability to compete during this period enabling Actavis to increase its unit sales and pricing power to the detriment of Lidoderm brand and generic purchasers.

8.      Actavis was ready to market its generic lidocaine patch immediately upon receiving final FDA approval.  Without the Agreement, Actavis could and would have launched its generic equivalent of Lidoderm much earlier than September 2013 because: (a) it received final FDA approval on August 23, 2012; (b) it had the resources available to make commercial quantities of the lidocaine patch; and (c) would have launched (i) "at risk" after termination of the 30 month stay in May 2012, (ii) after prevailing in the patent litigation, or (iii) pursuant to a settlement agreement with Endo that provided for an earlier entry date without the payoffs described here. Further, but for the Agreement, Endo would have launched its own less expensive

authorized generic version of the lidocaine patch that would have entered the market prior to September 2013 and in direct competition with Actavis' generic product. In turn, once Actavis' 180 day exclusivity expired, other generic manufacturers would have also launched generic lidocaine patches.

9.     These earlier generic launches would have resulted in consumers of Lidoderm and generic Lidoderm paying substantially less for their lidocaine patch purchases than they have actually paid. Defendants have shared in the illegal profits from this scheme. Defendants' illegal suppression of generic competition results in enormous overcharge damages to all purchasers of the drug at issue.

10.     Defendants' Agreement has: (a) delayed or precluded the launch of less expensive generic equivalents of Lidoderm in the United States; and (b) fixed, raised, maintained or stabilized the price of lidocaine patch products above the levels that would have otherwise existed if subject to competition. Defendants' Agreement was intended to and did, in fact: (a) preclude entry into the market of less expensive generic versions of lidocaine patches in the United States; (b) fix, raise, maintain or stabilize the prices of lidocaine patch products at supra-competitive levels; (c) permit Endo to monopolize the market for lidocaine patches in the United States; and (d) allocate 100% of the lidocaine patch market in the United States to Endo. As a direct and proximate result of Defendants' illegal conduct, Plaintiff and the Class have suffered damages.

## II.     JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action involving common questions of law or fact in which the aggregate amount in controversy exceeds $5,000,000, there are more than one hundred members of the

Class, and at least one member of the putative Class is a citizen of a state different from that of one of the Defendants.

12.     This Court also has jurisdiction over this matter pursuant to 15 U.S.C. § 26 and 28, U.S.C.§§ 1331 and 1337 in that Plaintiff brings claims under Section 16 of the Clayton Act, 15 U.S.C. § 26, for injunctive and equitable relief to remedy Defendants' violations of Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1-2. The Court has supplemental jurisdiction over Plaintiff's pendent state law claims pursuant to 28 U.S.C. § 1367.

13.     Venue is proper in this Court under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391, because Defendants transact business in this District. A substantial part of the interstate trade and commerce involved and affected by the violations of the antitrust laws was and is carried on in part within this District. The acts complained of have and will continue to have substantial effects in this District.

## III.   PARTIES

14.     Plaintiff, Irene Kampanis, is a resident of New York and a purchaser, during the class period described below, of Lidoderm.

15.     Defendant Endo Pharmaceuticals Inc. is a corporation organized and existing under the laws of the state of Delaware, with its principal place of business at 100 Endo Boulevard, Chadds Ford, Pennsylvania 19317. Endo Pharmaceuticals Inc. is a specialty pharmaceutical company engaged in the research, development, sale and marketing of prescription pharmaceuticals used primarily to treat and manage pain.

16.     Defendant Teikoku Seiyaku Co., Ltd. is a Japanese corporation, with its principal place of business at 567 Sanbonmatsu Higashikagawa, Kagawa 769-2695, Japan. Teikoku Seiyaku is a special pharmaceutical company that develops and makes enhanced pharmaceutical products based on its transdermal drug delivery technologies. Teikoku Seiyaku's drug delivery technologies include the technology used in the Lidoderm patch.

17.     Defendant Teikoku Pharma USA, Inc. is a California corporation, having a principal place of business at 1718 Ringwood Avenue, San Jose, California. Teikoku Pharma USA is a wholly-owned subsidiary of Teikoku Seiyaku Co., Ltd. On information and belief, Endo Pharmaceuticals Inc., Teikoku Pharma USA, Inc., and Teikoku Sieyaku Co., Ltd. are involved in a marketing enterprise that covers the distribution and marketing of Lidoderm in the United States. These entities have acted as a singular entity with respect to the material provisions and performance of the reverse payment, market allocation Agreement with Actavis, which refers to Endo Pharmaceuticals Inc., Teikoku Pharma USA, Inc., and Teikoku Seiyaku Co., Ltd. collectively in provisions relating to the grant of patent licenses to Actavis, the agreement not to launch a competing authorized generic during Actavis' generic exclusivity period, and the obligation to deliver free branded Lidoderm product to Actavis prior to any generic launch.

18.     Defendant Actavis, Inc. is a corporation organized and existing under the laws of Nevada, with its principal place of business at 400 Interplace Parkway, Parsippany, New Jersey

07054.

19.     Defendant Watson Pharmaceuticals, Inc. is a corporation organized under the laws of the state of Nevada, with its principal place of business at 400 Interplace Parkway, Parsippany, New Jersey 07054. Effective on or about January 24, 2013, Watson Pharmaceuticals, Inc. changed its name to Actavis, Inc.

20.     Defendant Watson Laboratories, Inc. is a corporation organized under the laws of the state of Nevada, with its principal place of business at 311 Bonnie Circle, Corona, California 92880. Watson Laboratories, Inc. is a wholly-owned subsidiary of Watson Pharmaceuticals, Inc., which is now Actavis, Inc.

21.     Defendant Anda, Inc. is a corporation organized under the laws of the state of Florida, with its principal place of business at 2915 Weston Road, Weston, FL 33331. Anda, Inc. is a wholly-owned subsidiary of Watson Pharmaceuticals, Inc., which is now Actavis, Inc.

22.     Defendant Anda Pharmaceuticals, Inc. is a corporation organized under the laws of the state of Florida, with its principal place of business at 6500 Adelaide Court, Groveport, Ohio 43125. Anda Pharmaceuticals, Inc. is a wholly-owned subsidiary of Watson Pharmaceuticals, Inc., which is now Actavis, Inc.

23.     Defendant Valmed Pharmaceuticals, Inc. is a corporation organized under the laws of the state of New York, with its principal place of business at 300 Alt Blvd., Grand Island,New York 14072. Valmed Pharmaceuticals, Inc. is a wholly-owned subsidiary of Watson Pharmaceuticals, Inc., now Actavis, Inc.

24.     Actavis, Inc., Watson Pharmaceuticals, Inc., Watson Laboratories, Inc., Anda, Inc., Anda Pharmaceuticals, Inc., and Valmed Pharmaceuticals, Inc. are collectively referred to herein as "Actavis." Actavis is engaged in the worldwide marketing, production and distribution

of generic pharmaceutical products, including in this judicial district.

25.     The actions taken by Defendants as described in this Complaint are part of, and were taken in furtherance of, the unlawful scheme alleged herein. These actions were authorized, ordered, and/or done by the Defendants' various officers, agents, employees, or other representatives while actively engaged in the management of the Defendants' affairs (or the affairs of Defendants' predecessors-in-interest) within the course and scope of their duties and employment, and/or with the actual, apparent, and/or ostensible authority of the Defendants.

## IV.    CLASS ACTION ALLEGATIONS

26.     Plaintiff brings this action on behalf of themselves and, under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, as representatives of a Class defined as follows:

> All persons in the United States, including the District of Columbia and Puerto Rico, who purchased and/or paid for some or all of the purchase price for branded and/or generic Lidoderm, in any form, for consumption by themselves or their families (the "Class") at any time during the period May 2, 2012, through the date the anticompetitive effects of Defendants' challenged conduct cease (the "Class Period").

27.     The following persons or entities are excluded from the proposed Class:

a.     Defendants and their officers, directors, management, employees, subsidiaries, or affiliates;

b.     All governmental entities, except for governmental funded employee benefit plans;

c.     All persons or entities who purchased Lidoderm or its AB-rated generic equivalent for purposes of resale or directly from Defendants or their affiliates;

d.     Any "flat co-pay" consumers whose purchases were paid in part by a third-party payor and whose co-payment was the same regardless of the retail purchase price; and

e.     The judges in this case and any members of their immediate families.

28.     Members of the Class are so numerous that joinder is impracticable. Although the exact number of Class members is unknown to Plaintiff, the members of the Class are widely dispersed throughout the country. Plaintiff believes the Class includes hundreds of thousands, if not millions, of consumers.

29.     Plaintiff's claims are typical of the members of the Class. Plaintiff and all members of the Class were damaged by the same wrongful conduct of the Defendants; i.e., they have paid artificially inflated prices for lidocaine patches and were deprived of the benefits of competition from less expensive generic versions of Lidoderm as a result of Defendants' wrongful conduct. Plaintiff will fairly and adequately protect and represent the interests of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the Class.

30.     Plaintiff is represented by counsel who are experienced and competent in the prosecution of class action antitrust litigation, particularly class action antitrust litigation in the Pharmaceutical industry.

31.     Questions of law and fact common to the members of the Class predominate over questions, if any, that may affect only individual Class members because the Defendants have acted on grounds generally applicable to the entire Class. Such generally applicable questions are inherent in Defendants' wrongful conduct.

32.     Questions of law and fact common to the Class include:

a.      whether the conduct alleged herein constitutes a violation of the antitrust or consumer protection laws alleged;

b.      whether Defendants conspired to suppress generic competition in the market for lidocaine patches;

c.      whether Endo paid Actavis consideration under the Agreement;

d.      whether the consideration Endo gave to Actavis was for a purpose other than prolonging Endo's monopoly in the market for lidocaine patches;

e.      whether the Agreement unlawfully precluded generic competitors not subject to the Agreement from entering the market for lidocaine patches;

f.      whether the Defendants' conduct harmed competition in the market for lidocaine patches;

g.      whether Endo possessed market or monopoly power over the market for lidocaine patches;

h.      whether the activities of Defendants as alleged herein have substantially affected interstate commerce; and

i.      whether, and to what extent, Defendants' conduct caused injury to the property of its indirect purchaser customers and if so, the appropriate measure of damages.

33.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously,

11

efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress on claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

34.     Plaintiff knows of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## V. REGULATORY AND ECONOMIC BACKGROUND

35.     Under the Federal Food, Drug, and Cosmetics Act (21 U.S.C. §§ 301-392), a manufacturer who creates a new, pioneer drug must obtain the approval of the FDA to sell the new drug by filing a New Drug Application ("NDA"). An NDA must include submission of specific data concerning the safety and efficacy of the drug, as well as any information on applicable patents.

36.     In 1984, Congress amended the Food, Drug and Cosmetics Act with the enactment of the Hatch-Waxman Act ("Hatch-Waxman"). Hatch-Waxman simplified the regulatory hurdles for prospective generic manufacturers by eliminating the need for them to file a lengthy and costly NDA in order to obtain FDA approval. Instead, the FDA provides an expedited review process by which generic manufacturers may file an Abbreviated New Drug Application ("ANDA").

37.     The ANDA is allowed to rely on the scientific findings of safety and efficacy included by the brand-name drug manufacturer in the original NDA if it is able to demonstrate that the proposed generic drug is "bioequivalent" to the corresponding brand drug, meaning it delivers the same amount of active ingredient into the body at the same rate as does the brand.

12

38.     As a counter-balance, Hatch-Waxman streamlined the process for a brand-name manufacturer to enforce its patents against infringement by generic manufacturers, and provided the brand-name manufacturer with an opportunity to obtain what is essentially a preliminary injunction, in the form of a 30-month stay of FDA approval of generic manufacturer's ANDAs.

39.     When the FDA approves a brand-name manufacturer's NDA, it publishes in a publication entitled "Approved Drug Products with Therapeutic Equivalence Evaluations" (known as the "Orange Book") any patents which, according to information supplied to the FDA by the brand-name manufacturer: (1) claim the approved drug or its approved uses; and (2) for which "a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use, or sale of the drug." 21 U.S.C. § 355(b)(l); 21 U.S.C. § 355(j)(7)(A)(iii). The FDA does not verify the information supplied by the brand-name manufacturer, but relies completely on the accuracy and truthfulness of applicant's representations. After an NDA is approved, the brand-name manufacturer may also list other new patents in the Orange Book as related to the NDA, if the brand-name manufacturer similarly certifies that the new patents meet the listing criteria.

40.     To obtain FDA approval of an ANDA (and thus the right to sell a generic version of a brand-name drug), a generic manufacturer must certify that the generic drug addressed in its ANDA will not violate any patent listed in the Orange Book as claiming the brand-name drug.

41.     Under Hatch-Waxman, a generic manufacturer's ANDA must contain one of four certifications:

        a.      that no patent for the brand-name drug has been filed with the FDA (a

13

"paragraph I certification");

      b.      that the patent for the brand-name drug has expired (a "paragraph II certification");

      c.      that the patent for the brand-name drug will expire on a particular date and the generic company does not seek to market its generic product before that date (a "paragraph III certification"); or

      d.      that the patent for the brand-name drug is invalid or will not be infringed by the generic manufacturer's proposed product (a "paragraph IV certification").

21 U.S.C. § 355(j)(2)(A)(vii).

42.      Alternatively, in the case of a method-of-use patent, an ANDA may assert that the patent is inapplicable to the use (commonly referred to as the "indication") for which the drug product will be marketed (commonly called a "section viii statement").

43.      The FDA must act on the application within 180 days of receipt, unless both the FDA and the applicant agree to extend the deadline. 21 U.S.C. § 355(j)(5)(A). In the case of a paragraph I or II certification, the ANDA will be given final approval as soon as it satisfies the necessary showings of safety and efficacy. 21 U.S.C. §355(j)(5)(B)(i). In the case of a paragraph III certification, the ANDA cannot receive final approval until expiration of the relevant patent(s) even if the ANDA applicant has previously satisfied the necessary showings of safety and efficacy. 21 U.S.C. §355(j)(5)(B)(ii).

44.      If a generic manufacturer files a paragraph IV certification that the listed patent is invalid or will not be infringed, it must promptly give notice to both the NDA owner and the owner of the patent(s) at issue. The filing of an ANDA with a paragraph IV certification gives rise to cause of action for patent infringement. 35 U.S.C. § 271(e)(2)(A). If the patent owner

initiates an infringement action against the ANDA filer within 45 days, then the FDA may not grant final approval to the ANDA until the earlier of either (a) 30 months or (b) the issuance of a decision by a court that the patent is invalid or not infringed by the generic manufacturer's ANDA. 21 U.S.C. §355(j)(5)(B)(iii). If, however, the patent owner fails to initiate a patent infringement action within 45 days after receiving notice of the generic manufacturer's paragraph IV certification, then the FDA may grant final approval to the generic manufacturer's ANDA as soon as the necessary safety and efficacy requirements have been demonstrated. Accordingly, the timely filing of an infringement action provides the patent owner with the equivalent of an automatic preliminary injunction for 30 months. Prompt disposition of such an action, however, as through a motion for summary judgment, may mean more rapid approval for a generic manufacturer subject to such a stay.

45.     To encourage generic manufacturers to challenge branded drug patents and/or to design around them, Hatch-Waxman grants the first paragraph IV ANDA filer an 180-day exclusivity period to market the generic version of the drug, during which the FDA may not grant final approval to any other generic manufacturer's ANDA for the same brand-name drug. 21 U.S.C. § 355(j)(5)(B)(iv) and 21 U.S.C. § 355(j)(5)(D).

46.     Typically, AB-rated generic versions of brand-name drugs are priced significantly below the brand-name counterparts. Because of the price differentials, and other institutional features of the pharmaceutical market, AB-rated generic versions are rapidly and substantially substituted for their brand-name counterparts. When multiple generic manufacturers enter the market, prices for generic versions of a drug predictably decrease significantly because of competition among the generic manufacturers, and because the loss of sales volume by the brand-name drug to the corresponding generics is dramatic.

47.     An AB rating is particularly significant to a generic manufacturer because, under the statutory regime enacted by both Congress (i.e., Hatch-Waxman) and most state legislatures (i. e., Drug Product Selection laws, or "DPS laws"), pharmacists may (and, in most states, must) substitute an AB-rated generic version of a drug for the brand-name drug without seeking or obtaining permission  from the prescribing doctor. Indeed, both  Congress and  the state legislatures have actively encouraged generic substitution because of their recognition that the economics of the pharmaceutical industry prevent generic manufacturers from simultaneously: (a) engaging in the type of heavy promotion or "detailing" typically done by brand-name manufacturers; and (b) providing the enormous cost savings to purchasers and consumers generated by generic drugs.

48.     Generic competition enables direct purchasers to: (a) purchase generic versions of brand-name drugs at substantially lower prices; and/or (b) purchase the brand-name drug at reduced prices. However, until generic manufacturers enter the market with an AB-rated generic, there is no bioequivalent generic drug which competes with the brand-name drug, and therefore, the brand-name manufacturer can continue to charge supracompetitive prices profitably without losing all or a substantial portion of its brand-name sales. Consequently, brand-name drug manufacturers have a strong incentive to use various tactics, including the tactics alleged herein, to delay the introduction of AB-rated generic competition into the market.

## VI.    FACTUAL ALLEGATIONS

### A.    Actavis Files an ANDA and Endo Sues for Patent Infringement

49.     On March 19, 1999, the FDA approved an NDA, under § 505(b) of the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 355(b), for Lidoderm, an adhesive patch product that contains lidocaine in the amount of 5%, for the relief of pain associated with post-herpetic

neuralgia ("PHN").

50.     Approximately 500,000 cases of herpes zoster, commonly known as shingles, occur in the United States each year. The most common complication of herpes zoster is PHN. This disorder is characterized by pain along the cutaneous nerve region of a previous herpes zoster flare-up that persists for more than 30 days after the lesions have resolved. Approximately 20% of patients with herpes zoster will experience this complication.

51.     Teikoku Pharma USA, Inc., a wholly-owned subsidiary of Teikoku Seiyaku Co., Ltd. (collectively, "Teikoku"), is currently the owner of and entity responsible for the Lidoderm Patch NDA.

52.     Endo Pharmaceuticals, Inc. has the exclusive right to market and distribute the Lidoderm Patch in the United States and sells the product under the authority of Teikoku's NDA.

53.     Prior to the FDA approval of Lidoderm, on October 27, 1998, the PTO issued Patent No. 5,827,529 ("the '529 patent"), entitled "External Preparation for Application to the Skin Containing Lidocaine." The '529 patent expires October 27, 2015.

54.     Following the issuance of the '529 patent, Teikoku submitted information regarding the '529 patent to the FDA for listing in the Orange Book with respect to Lidoderm. The FDA thereafter listed the '529 patent in the Orange Book with respect to Lidoderm. Endo Pharmaceuticals, Inc. is the exclusive licensee of the '529 patent.

55.     On November 13, 2009, Actavis submitted ANDA No. 20-675 to the FDA, seeking approval to market a generic equivalent of the lidocaine topical patch.

56.     On or about January 14, 2010, Actavis notified Teikoku that it had filed ANDA No. 20-675. Actavis' notice letter included a paragraph IV certification that the commercial manufacture, use and/or sale of its generic Lidoderm product would not infringe any valid claim

of the '529 patent.

57.     As the first-filer of an ANDA for generic Lidoderm, Actavis is entitled to market its generic Lidoderm for 180 days free of competition from other ANDA-based generic Lidoderm products. This exclusivity does not, however, protect Actavis from competition from a less expensive authorized generic version of Lidoderm, as sold by Endo or a licensee of Endo.

58.     On February 19, 2010, Endo sued Actavis in the United States District Court for the District of Delaware, alleging that Actavis' filing of its ANDA infringed the '529 patent. Endo's infringement suit triggered a 30-month stay that prohibited the FDA from granting Actavis final approval to launch a generic equivalent of Lidoderm until the earlier to occur of: (1) a final judgment that the '529 patent was invalid, unenforceable, and/or not infringed; or (2) July 14, 2012. Actavis counterclaimed, seeking Declaratory Judgment that: (1) the '529 patent was invalid; (2) Actavis' proposed generic product did not infringe the '529 patent; and (3) the '529 patent was unenforceable for inequitable conduct.

59.     Actavis' success in litigation involving the '529 patent would not only have enabled Actavis to start competing with its lower-priced generic Lidoderm product, but would also open the flood gates to competition from other generic manufacturers (including, but not limited, to a potential authorized generic sold by Endo). Because generic versions of brand-name drugs are typically much less expensive than their brand-name counterparts, and because purchasers typically switch rapidly from a brand to a generic once the generic becomes available, Endo's monopoly prices and profits would have quickly come to an end once Actavis or other lower-priced generic versions of the product entered the market.

60.     In 2012, Endo sold over $950 million worth of Lidoderm, accounting for almost

31% of Endo Pharmaceuticals, Inc.'s sales revenue that year. During this period, Endo possessed the market power to charge high prices on Lidoderm without losing customers, and it used its market power repeatedly, raising prices even in the face of flat costs, while simultaneously increasing its sales volume.

61.     Endo, fearing generic competition and determined to protect its monopoly for Lidoderm, decided to obtain additional patent protection for Lidoderm. In November 2009, Endo Pharmaceuticals, Inc. obtained an exclusive license for three additional patents, Patent No. 5,741, 510 ("the '510 patent"), Patent No. 6,096,333 ("the '333 patent") and Patent No. 6,096,334 ("the '334 patent"). The '510 patent, the '333 patent, and the '334 patent (collectively, "the Rolf patents") are all part of a single patent family. Endo Pharmaceuticals, Inc. subsequently became the owner and assignee of the Rolf patents. The Rolf patents each expire on March 30, 2014.

62.     Although Endo Pharmaceuticals, Inc. obtained an exclusive license under the Rolf patents in November 2009, it wasn't until October 2010, and well after the filing of Actavis' ANDA No. 20-675 that Endo Pharmaceuticals, Inc. granted Teikoku a sublicense under the '510 patent to make and sell prescription pain medicines and treatments that contain 5% lidocaine, in a patch dosage form, including Lidoderm. Promptly thereafter, Teikoku submitted the '510 patent to the FDA for listing in the Orange Book with respect to Lidoderm despite the fact that it claimed in a prior litigation that the '510 patent was invalid and not infringed by the branded Lidoderm product. *See Lectec Corp. v. Chattem, Inc.,* Case No. 08-00130, ECF No. 20, filed Sept. 30, 2008 (E.D. Tex.).

63.     Teikoku did not submit to the FDA information regarding the '333 patent or '334 patent for listing in the Orange Book with respect to the Lidoderm Patch.

64.      Pursuant to CFR § 314.94(a)(12)(vi), Actavis was not required to file any certification, including paragraph IV certification, to the '510 patent, and Actavis did not do so.

65.      On June 27, 2011, Actavis obtained a favorable claim construction ruling on the '529 Patent in the pending infringement suit and, as a result, was poised to prevail in the litigation based on a finding of non-infringement and/or obviousness.

66.      Two days later, on June 29, 2011, Endo Pharmaceuticals, Inc. filed a patent infringement lawsuit against Actavis in the United States District Court for the District of Delaware, alleging that Actavis had infringed the Rolf patents. Actavis counterclaimed, seeking Declaratory Judgments that the Rolf patents were invalid and/or unenforceable and that Actavis' proposed generic product did not infringe the Rolf patents. On information and belief, Actavis' defenses and counterclaims were strong and, absent a settlement, Actavis was likely to prevail in the litigation on the Rolf patents.

67.      From February 6-14, 2012, a Judge Gregory M. Sleet in the United States District Court for the District of Delaware conducted a bench trial in relation to the '529 patent. Actavis vigorously argued that the '529 patent was invalid and/or unenforceable due to inequitable conduct and that Actavis' ANDA product would not infringe the '529 patent. By the end of the trial, it was clear that the only way Endo could prevail on its infringement claim was by recycling arguments that the court had previously rejected in the June 2011 claim construction ruling.

**B.      Actavis and Endo Scheme to Allocate the Lidocaine Patch Market Illegally**

68.      After the bench trial, and before an adverse decision from the court was issued, Endo and Actavis entered into the Agreement, whereby Endo paid Actavis substantial

consideration for Actavis' agreement to: (a) drop its challenge to Endo's Lidoderm patents and

(b) to refrain from selling a lower-priced generic version of Lidoderm until September 15, 2013.

In addition, Endo agreed not to launch an authorized generic version of Lidoderm (or to grant a

license to anyone else to sell an authorized generic) for a period of seven and one-half months

after Actavis entered the market. The Agreement allowed Endo to avoid the loss of its Lidoderm

patents and preserve its monopoly profits on Lidoderm sales.

69.     On May 28, 2012, Endo and Actavis consummated the settlement of the '529 and

the Rolf patent litigations, pursuant to which Actavis agreed to drop its challenges to the '529

and Rolf patents and to refrain from launching a generic equivalent of Lidoderm until September

15, 2013. The Agreement specifically provides:

> Subject to Section 2(d), Watson agrees, on behalf of itself and
> its Affiliates, that, prior to the Start Date, it and its Affiliates shall
> not directly or indirectly market, offer to sell, sell, have sold,
> import, manufacture or have manufactured in the United States any
> of Watson's Generic Product. Watson acknowledges and agrees that
> each of Endo and Teikoku would be irreparably harmed should
> Watson breach this Section 2(e). Nothing in this Agreement
> shall prohibit or preclude Watson from exercising its  rights
> under 35 U.S.C. § 271(e)(l ). Settlement Agreement at Section
> 2(e).
>
> ****
>
> "Start Date" means the earliest of: (i) September 15, 2013; (ii) the
> date of Launch of any Generic Product other than Watson's
> Generic Product; or (iii) the last day before Watson would forfeit
> its 180-day generic drug  exclusivity  with  respect  to  Watson's
> Generic Product due to the operation of 21 U.S.C. 355(j)(5)(D)(ii)
> as a result of a forfeiture event under 21 U.S.C. 355(j)(5)(D)(i)(I).
> Id. at Section l (v).

70.     In exchange for Actavis' agreement to drop its challenge to Endo's patents for the

lidocaine patch, 5%, delaying the launch of its lower-priced generic equivalent,  Endo agreed to share

with Actavis a portion of its monopoly profits.  The parties entered a "Brand Product Supply" provision in

which Endo traded profits for extended sales exclusivity for Lidoderm. The Agreement reads in

pertinent part:

> Endo/Teikoku shall provide, at no cost, to Watson's Wholesaler Affiliate Brand Product of value totaling twelve million dollars ($12,000,000) per month, as measured at the time of each delivery by the then-prevailing Wholesale Acquisition Cost as defined in the Red Book or, if the Red Book is not available, any other comparable U .S. price listing ("WAC"), on the first business day of each month beginning January 1, 2013 and ending August 1, 2013 (for a total of eight (8) months) for Watson's Wholesaler Affiliate's disposal as provided in Section 3(e). Endo shall provide to Watson's Wholesaler Affiliate an invoice with respect to such Brand Product, which invoice shall reflect the transfer of Brand Product to Watson's Wholesaler Affiliate at no cost. Notwithstanding the foregoing, Endo/Teikoku's obligations under this Section 3(b) shall terminate immediately upon the Launch of any Third Party Generic Product in the United States. The Brand Product provided to Watson's Wholesaler Affiliate by Endo/Teikoku shall have the same NDC number as the Brand Product sold by Endo. In any month in which Endo/Teikoku has provided to Watson's Wholesaler Affiliate any Brand Product under this Section 3(b), and in which a Third Party has Launched a Generic Product in the United States, Watson shall either (i) return to Endo a pro rata quantity of the Brand Product delivered by Endo/Teikoku during such month, or (ii) reimburse Endo in cash for the value of the Brand Product (based on the WAC measured at the time of delivery by Endo/Teikoku to Watson's Wholesaler Affiliate), in either case for the pro rata portion of the month on and after such Launch computed as the product of (A) (x) in the case of a return of Brand Product to Endo under clause (i), the quantity of Brand Product delivered by Endo/Teikoku during such month, or (y) in the case of a cash reimbursement to Endo under clause (ii), the value of the Brand Product delivered by Endo/Teikoku, and (B) the number of days in the month on and after such Launch divided by (C) the total number of days in the month. Such return or reimbursement shall be made by Watson to Endo within five (5) business days of the date of the Launch of a Generic Product in the United States. Settlement Agreement at Section 3(b).

****

>The Brand Product supplied by Endo/Teikoku to Watson's Wholesaler Affiliate under Sections 3(b) through (d) may be resold solely by Watson's Wholesaler Affiliate to Third Parties for use solely in the United States on pricing and other terms determined by Watson's Wholesaler Affiliate in its sole discretion, provided that neither Watson nor any of its Affiliates (including its Wholesaler Affiliate) shall sell, distribute or dispose of Branded Product in any manner that would constitute a Bundled Sale. Watson agrees that its Wholesaler Affiliate will honor all Endo price-related contracts as communicated to all Endo wholesalers from time to time in the ordinary course of business, provided that the price related contracts do not impose any requirements on Watson's Wholesaler Affiliate that would be inconsistent with requirements imposed upon other Lidoderm® wholesalers, and further provided that such price-related contracts shall not conflict with the terms of this Agreement. Watson shall comply with all Applicable Laws in connection with its resale of the Brand Product. Settlement Agreement at Section 3(e).

71.     The parties expressly provide in the Agreement at Section l (a) that "Affiliate" means an entity that "directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with a given entity." Anda, Inc., Anda Pharmaceuticals, Inc., and Valmed Pharmaceuticals, Inc., all wholly-owned subsidiaries of Actavis, were designated as Watson's Wholesaler Affiliates under the Agreement. These entities thus operated as a single entity for purposes of carrying out the terms and purposes of the anticompetitive Agreement.

72.     Actavis' agreement to honor all Endo price-related contracts effectively prevented Actavis from selling any of the branded product delivered pursuant to the Agreement at prices appreciably lower than the supracompetitive prices charged by Endo for the brand product. In fact, Anda, Inc., Anda Pharmaceuticals, Inc., and Valmed Pharmaceuticals, Inc. (Actavis' wholly-owned subsidiaries designated as Watson's Wholesaler Affiliates under the Agreement) maintained the supracompetitive prices for branded Lidoderm throughout the term of the Agreement.

23

73.     The Agreement further provided that if Actavis did not receive FDA approval of its generic Lidoderm product by January 1, 2014, Endo would make up to twelve additional monthly payments to Actavis in the form of $6,666,667 in free-of-charge Branded Product. The monthly payments would terminate if Actavis received FDA approval or if a third party launched a generic product during that period.

74.     In addition, the Agreement provided that if Actavis did not receive FDA approval of its generic Lidoderm product by January 1, 2015, Endo would make up to nine additional monthly payments to Actavis in the form of $7,111,111 in free-of-charge Branded Product. These monthly payments would terminate the month before the termination date of the '529 patent, or would terminate earlier if Actavis received FDA approval or if a third party launched a generic product during that period.

75.     The compensation to Actavis under the Agreement in the form of at least $96 million dollars-worth, and possibly as much as $240 million dollars-worth, of free-of-charge Brand Product far exceeded Endo's avoided litigation costs and, as the Agreement expressly provided, was consideration for the settlement of the litigation and independent of any other transaction:

> Endo/Teikoku and Watson agree that the Brand Product provided by Endo/Teikoku to Watson's Wholesaler Affiliate hereunder is a good-faith, bargained-for resolution of the claims at issue in the Litigation. The Brand Product provided hereunder is not contingent on any past or future purchase of any product from Endo or Teikoku by Watson or any of its Affiliates. Agreement, Section 3(i).

76.     Endo also agreed not to launch an authorized generic version of Lidoderm (or to grant a license to anyone else to sell an authorized generic) for a period of seven and one-half months after Actavis entered the market. The Agreement reads:

> License. Subject to the terms and conditions of this Agreement, Endo/Teikoku hereby grant to Watson a non-exclusive (other than pursuant to Section 2(b)), royalty-bearing, non-transferable (other than pursuant to Section 21) and non-sublicensable (other than pursuant to Section 2(c)) license to the Licensed Patents to make, have made, import, use, sell, and offer for sale Watson's Generic product in the United States solely during the License Term.  Settlement Agreement at Section 2(a).

> \*\*\*\*\*

> AG Product. The license granted pursuant to Section 2(a) shall be partially exclusive for a period of time in that Endo/Teikoku and their respective Affiliates shall not market or sell a Generic Product, or authorize or license a Third Party to market or sell and AG Product at any time before the earlier of (i) seven and a half (7.5) months from the Start Date, and (ii) the Launch of any Third Party Generic Product in the United States. Settlement Agreement at Section 2(b) (Emphasis Added).

77.     A brand company's launch of an authorized generic is extremely damaging to any first-filer generic, such as Actavis, because it results in lost market share (i.e., fewer units sold), reduced profits because price competition between the generic and authorized generic forces down prices, and a reduction in the generic's long-term "first mover advantage." As the FTC noted in a June 2009 report on authorized generics, "consumers benefit and the healthcare system saves money during the 180-day exclusivity period when an [authorized generic] enters the market, due to the greater discounting that accompanies the added competition provided by the [authorized generic]."

78.     Notably, although a brand company can lower the prices on its brand products instead of launching an authorized generic, that option does not present the same danger to a generic such as Actavis, and does not result in the same savings to purchasers. This is because many states have regulations that either require or strongly encourage pharmacists to automatically fill prescriptions with only an AB-rated generic version of a drug in most

situations. Thus, even if an NDA holder (such as Endo) lowers the price of its brand drug, state regulations are a barrier that prevent or impede the branded drug from being used for most prescriptions since it is still considered a "brand" drug. The result is that most of a generic's sales volume is unaffected by a reduction in the brand price and the generic does not feel the competitive pressure to lower its prices in response to a drop in the branded price (in contrast to the situation where a branded company launches an authorized generic). Thus, while an NDA holder can try to compete against a generic drug through various means other than launching an authorized generic, those competitive options are far weaker and do not provide nearly the consumer savings and benefits as the launch of a true authorized generic, which has it own unique NDC number, generic trade dress, generic pricing, and is formally considered a "generic" product in managed care sectors. Consequently, Endo's agreement to restrict its competitive responses to far less effective options was an illegal, anticompetitive agreement by which the parties agreed to restrict competition that would have undermined Actavis' sales and/or constrained Actavis' prices for up to seven and one-half months after the launch of Actavis' generic, all of which results in overcharges to purchasers.

79.     Indeed, in its June 2009 report regarding authorized generics, the FTC expressly concluded that a generic manufacturer might agree to delay the sale of its generic product in exchange for a brand company's agreement (such as the one involved here), to not launch an authorized generic to consumers' detriment:

> To prevent this loss of revenue, a generic may be willing to delay its entry in return for a brand's agreement not to launch an authorized generic - that is, a brand's agreement not to compete with the generic through an AG - during the generic's 180 days of marketing exclusivity . . . . Such agreements can harm consumers . . . .

A "no authorized generic" reverse payment can actually be more anticompetitive than a cash

reverse payment because it creates two levels of harm to competition: not only is generic entry delayed, but when it does ultimately occur, it results in supracompetitive prices because there is no authorized generic on the market to effectuate price competition.

80.     According to the FTC report, "Revenues of a sole ANDA generic company during the 180-day exclusivity period drop substantially with [authorized generic] entry, with estimates of the average decline ranging from 47% to 51%." FTC Rpt. at 3.

81.     Under the terms of the Agreement, Actavis agreed to kick back to Endo a share of the increased profits that would result from Endo's agreement not to launch an authorized generic during Actavis' exclusivity period. The Agreement provided for the allocation of profits from the supracompetitive generic pricing during the exclusivity period through a 25% royalty on Actavis sales during the period in which no other generic was on the market:

> Beginning with the First Commercial Sale of Watson's Generic Product and until the date of the occurrence of the First Commercial Sale by a Third Party or Endo/Teikoku or their Affiliates of a Generic Product or AG Product in the United States, Watson shall pay to Endo royalty payments equal to twenty-five percent (25%) of all Gross Profit of Watson's Generic Product. For the avoidance of doubt, this royalty obligation is terminated entirely on the date of the First Commercial Sale by a Third Party or Endo/Teikoku or their Affiliates of a Generic Product or AG Product in the United States, so that Watson will owe no royalty as of that first date, other than royalties then accrued but not yet paid. Agreement Section 3(a).

82.     Endo's unexplained agreement to pay $96 to $240 million, combined with its unexplained agreement to forego its right to launch a competing authorized generic product during the generic exclusivity period:

     a.     indicates that Endo had serious doubts about the patents' validity and/or enforceability against Actavis;

     b.     provides strong evidence that Endo sought to induce Actavis to abandon

its challenge to Endo's patents in exchange for a share of Endo's monopoly profits that would

otherwise have been lost in the competitive market; and

        c.        indicates that the consideration's objective was to maintain supra-

competitive prices to be shared between Endo and Actavis, rather than face what might have been

a competitive market.

83.        Actavis received final approval to launch its generic Lidoderm product on

August 23, 2012. However, in accordance with the Agreement, Actavis did not launch its less

expensive generic product at that time, nor did Endo launch its less expensive authorized

generic. Rather, Endo continued to enjoy the monopoly profits derived from its market

exclusivity and, on January 1, 2013, began to deliver no-cost branded product to Actavis,

which Actavis could and did resell at the branded Lidoderm monopoly price. When Actavis

finally did launch its AB-rated generic product in September 2013, Endo complied with the

Agreement and did not launch a competing authorized generic. As of the date of filing of this

Complaint, the Actavis product remains the only AB-rated generic equivalent to Lidoderm

available in the United States.

84.        But for Defendants' ongoing, illegal, anticompetitive conduct, a less expensive

generic equivalent of Lidoderm and a less expensive authorized generic version of Lidoderm

would have been available in the United States far earlier than September 2013.

85.        But for Defendants' ongoing, illegal, anticompetitive conduct, Plaintiff and other

members of the Class would have paid lower prices for Lidoderm and its generic equivalent long

before September 2013. As a result, Defendants, by their conduct, have injured Plaintiff and

other members of the Class by causing them to pay hundreds of millions of dollars in

overcharges on their purchases of Lidoderm.

## VII.   ANTICOMPETITIVE EFFECT

86.     The Agreement has enabled the Defendants to: (a) preclude the entry of less expensive generic versions of Lidoderm products in the United States; (b) fix, raise, maintain, or stabilize the price of Lidoderm products; and (c) allocate 100% of the U.S. market for lidocaine patches to Endo.

87.     Actavis' ANDA was finally approved by FDA on August 23, 2012. But for the illegal Agreement between Endo and Watson (which included financial inducements to delay the launch of less expensive generic versions of Lidoderm) Actavis would have begun selling a less expensive AB-rated generic version of Lidoderm shortly thereafter. Such sales would have occurred via market entry by Actavis through (a) an agreement between Endo and Actavis which did not include illegal, large financial inducements to delay generic launch and thus would allow for market entry prior to September 2013, (b) a victory by Actavis in the patent litigation, or (c) a launch "at risk" by Actavis upon termination of the 30 month stay but before termination of the patent litigation. In addition, upon market entry by Actavis, Endo would have begun selling its own less expensive authorized generic version in direct competition.

88.     An increasingly competitive market for lidocaine patches would have thereafter emerged as additional generic manufacturers entered the market.

89.     Defendants' unlawful concerted action has delayed or prevented the sale of generic Lidoderm in the United States, and unlawfully enabled Endo and Actavis to sell Lidoderm at artificially inflated, supracompetitive prices. But for Defendants' illegal conduct, generic competition to Lidoderm would have occurred already because one or more of the generic companies would have already entered with its generic version of Lidoderm.

90.     The anticompetitive harm in the form of delayed AB-rated and authorized generic entry and restricted generic competition after entry far outweighs the pro-competitive benefits, if any, of the Agreement.

91.     At all material times, Lidoderm, manufactured and sold by Endo, was shipped across state lines and sold to customers located outside its state of manufacture.

92.     During the relevant time period, in connection with the purchase and sale of Lidoderm, monies as well as contracts, bills and other forms of business communication and transactions were transmitted in a continuous and uninterrupted flow across state lines.

93.     During the relevant time period, various devices were used to effectuate the illegal acts alleged herein, including the United States mail, interstate and foreign travel, and interstate and foreign telephone commerce. The activities of Defendants, as charged in this Complaint were within the flow of, and have substantially affected, interstate commerce.

94.     Defendants' anticompetitive conduct has substantial intrastate effects in each state in that, inter alia, retailers within each state are foreclosed from offering less expensive generic Lidoderm to consumers inside each respective state. The foreclosure of generic Lidoderm directly impacts and disrupts commerce for consumers within each state.

95.     During the relevant time period, branded Lidoderm was shipped into each state and was sold to or paid for by consumers. Beginning in September 2013, an AB-rated generic version of Lidoderm was shipped into each state and sold to or paid for by consumers.

96.     Defendants' conduct as set forth in this Complaint had substantial effects on intrastate commerce in each state because Lidoderm was sold to consumers in each state and Defendants entered into an unlawful anticompetitive agreement that affected

commerce in each state.

## IX.   MARKET POWER AND RELEVANT MARKET

97.     At all relevant times, Endo had monopoly power over lidocaine patches because it had the power to maintain the price of the drug it sold as Lidoderm at supracompetitive levels without losing substantial sales to other products prescribed and/or used for the same purposes as Lidoderm, with the exception of AB-rated generic versions of Lidoderm.

98.     A small but significant, non-transitory price increase for Lidoderm by Endo would not have caused a significant loss of sales.

99.     Lidoderm does not exhibit significant, positive cross-elasticity of demand with respect to price with any product other than AB-rated generic versions of Lidoderm.

100.    There are no reasonably interchangeable drug products that are available to prescribing physicians for the indications for which lidocaine patches are prescribed. Endo needed to control only Lidoderm and its AB-rated generic equivalents, and no other products, in order to maintain the price of Lidoderm profitably at supracompetitive prices. Only the market entry of a competing, AB-rated generic version of Lidoderm would render Endo unable to profitably maintain its current prices of Lidoderm without losing substantial sales.

101.    Lidoderm is unique and not reasonably interchangeable with other therapies for the treatment of post herpetic neuralgia. Prior to the launch of AB-rated generic equivalents in September 2013, Lidoderm was the only topical lidocaine patch available in the U.S. market and the only topical patch approved by the U.S. Food and Drug Administration ("FDA") for the treatment of post-herpetic neuralgia.

102.    Endo also sold Lidoderm at prices well in excess of marginal costs, and substantially in excess of the competitive price, and enjoyed high profit margins.

103.    Defendants have had, and exercised, the power to exclude and restrict competition to Lidoderm and AB-rated bioequivalent generics.

104.    Without the power to exclude and restrict competition to lidocaine patches (Lidoderm and AB-rated bioequivalent generics), and ability to sell its own branded version of that drug, Lidoderm, at prices well in excess of marginal costs, it would not have been economically rational for Endo to provide Actavis with the herein alleged substantial financial inducements for the purpose of delaying Actavis' launch of its AB-rated generic Lidoderm product.

105.    Endo, at all relevant times, enjoyed high barriers to entry with respect to competition to the above-defined relevant product market due to patent and other regulatory protections and high costs of entry and expansion.

106.    To the extent that Plaintiff is legally required to prove monopoly power through circumstantial evidence by first defining a relevant product market, Plaintiff alleges that the relevant market is for lidocaine patches (i.e., Lidoderm and its AB-rated generic equivalents). During the period relevant to this case, Endo has been able to profitably maintain the price of lidocaine patches well above competitive levels.

107.    The relevant geographic market is the United States. At all relevant times prior to Actavis' launch of an AB-rated generic equivalent of Lidoderm in September 2013, Endo's market share in the relevant market was 100%, implying a substantial amount of monopoly power.

## CLAIM I: MONOPOLIZATION UNDER STATE LAW
### (Asserted against Endo and Teikoku Defendants)

108.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

109.     This claim is pled as to Endo, Teikoku Seiyaku and Teikoku Pharma.

110.     At all relevant times, Endo and Teikoku possessed substantial market power (*i.e.*, monopoly power) in the relevant market. Endo and Teikoku possessed the power to control prices in, prevent prices from falling in, and exclude competitors from the relevant market.

111.     Through the overarching anticompetitive scheme, as alleged above, Endo and Teikoku willfully maintained their monopoly power in the relevant market using restrictive or exclusionary conduct, rather than by means of greater business acumen, and injured Plaintiff and the Class thereby.

112.     It was Endo's and Teikoku's conscious objective to further their dominance in the relevant market by and through the overarching competitive scheme.

113.     Endo and Teikoku's scheme harmed competition and as a direct and proximate result of Endo and Teikoku's illegal and monopolistic conduct, as alleged herein, Plaintiff and the Class were harmed.

114.     By engaging in the foregoing conduct, Endo and Teikoku have intentionally and wrongfully maintained monopoly power in the relevant market in violation of the following state laws:

     a.     Arizona Rev. Stat. §§ 44-1403, *et seq.*, with respect to purchases in Arizona by members of the Class Arizona by members of the Class.

     b.     Cal. Bus. & Prof. Code §§ 17200, *et seq.*, and California common law with respect to purchases in California by members of the Class.

     c.     D.C. Code §§ 28-4503, *et seq.*, with respect to purchases in the District of Columbia by members of the Class.

     d.     Fla. Stat. §§ 501.201, *et seq.*, with respect to purchases in Florida by

members of the Class.

e.      740 Ill. Comp. Stat. 10/3, *et seq.*, with respect to purchases in Illinois by members of the Class.

f.      Iowa Code § 553.5 *et seq.*, with respect to purchases in Iowa by members of the Class.

g.      Mass. Gen. L. Ch. 93A, *et seq.*, with respect to purchases in Massachusetts by members of the Class, with thousands of Massachusetts consumers paying substantially higher prices for Lidoderm and its generic equivalents in actions and transactions occurring substantially within Massachusetts.

h.      Me. Rev. Stat. Ann. 10, §§ 1102, *et seq.*, with respect to purchases in Maine by members of the Class.

i.      Mich. Comp. Laws Ann. §§ 445.773, *et seq.*, with respect to purchases in Michigan by members of the Class.

j.      Minn. Stat. §§ 325D.49, *et seq.*, and Minn. Stat. § 8.31, *et seq.*, with respect to purchases in Minnesota by members of the Class.

k.      Miss. Code Ann. §§ 75-21-3, *et seq.*, with respect to purchases in Mississippi by members of the Class.

l.      Neb. Code Ann. §§ 59-802, *et seq.*, with respect to purchases in Nebraska by members of the Class.

m.      Nev. Rev. Stat. Ann. §§ 598A.060, *et seq.*, with respect to purchases in Nevada by members of the Class.

n.      N.M. Stat. Ann. §§ 57-1-2, *et seq.*, with respect to purchases in New Mexico by members of the Class.

      o.        N.C. Gen. Stat. §§ 75-2.1, *et seq.*, with respect to purchases in North Carolina by members of the Class.

      p.        N.D. Cent. Code §§ 51-08.1-03, *et seq.*, with respect to purchases in North Dakota by members of the Class.

      q.        Or. Rev. Stat. §§ 646.705, *et seq.*, with respect to purchases in Oregon by members of the Class.

      r.        Pa. Stat. Ann. §§ 201–1, et seq., with respect to purchases in Pennsylvania by members of the Class.

      s.        10 L.P.R.A. § 260, *et seq.*, with respect to purchases in Puerto Rico by members of the Class.

      t.        R.I. Gen. Laws §§ 6-36-5 *et seq.*, with respect to purchases in Rhode Island by members of the Class.

      u.        S.D. Codified Laws §§ 37-1-3.2, *et seq.*, with respect to purchases in South Dakota by members of the Class.

      v.        Utah Code Ann. §§ 76-10-911, *et seq.*, with respect to purchases in Utah by members of the Class.

      w.        Vt. Stat. Ann. 9, §§ 2453, *et seq.*, with respect to purchases in Vermont by members of the Class.

      x.        W.Va. Code §§ 47-18-4, *et seq.*, with respect to purchases in West Virginia by members of the Class.

      y.        Wis. Stat. §§ 133.03, *et seq.*, with respect to purchases in Wisconsin by members of the Class.

### CLAIM II: CONSPIRACY TO MONOPOLIZE UNDER STATE LAW
### (Asserted against Endo and Teikoku Defendants)

115.     Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

116.     This claim is pled as to Endo, Teikoku Seiyaku and Teikoku Pharma.

117.     With regard to all conduct complained of above, at all relevant times, Endo acted in concert with Teikoku to maintain their monopoly power.

118.     At all relevant times, Endo and Teikoku possessed substantial market power (*i.e.*, monopoly power) in the relevant market. Endo and Teikoku possessed the power to control prices in, prevent prices from falling in, and exclude competitors from the relevant market.

119.     Through the anticompetitive scheme alleged herein Endo and Teikoku conspired to maintain Endo's monopoly power in the relevant market in order to block and delay market entry of lidocaine patch 5%, *i.e.*, AB-rated generic versions of Lidoderm. The scheme allocated all sales of lidocaine patch 5% in the United States to Endo and Teikoku; delayed the sales of generic Lidoderm products; and fixed the price at which Plaintiff and members of the Class would pay for lidocaine patch 5% at the higher, branded price.

120.     The goal, purpose and/or effect of the scheme was to maintain and extend Endo and Teikoku's monopoly power in the United States market for lidocaine patch 5%. The scheme prevented and/or delayed generic competition to Lidoderm and enabled Endo and Teikoku to continue charging supracompetitive prices for Lidoderm without a substantial loss of sales.

121.     Endo and Teikoku knowingly and intentionally conspired to maintain and enhance Endo and Teikoku's monopoly power in the relevant market.

36

122.     Endo and Teikoku specifically intended that their scheme would maintain Endo and Teikoku's monopoly power in the relevant market, and injured Plaintiff and the Class thereby.

123.     Endo and Teikoku each committed at least one overt act in furtherance of the conspiracy.

124.     There is and was no legitimate, non-pre-textual, pro-competitive justification for Endo and Teikoku's actions comprising the anticompetitive scheme that outweigh their harmful effect. Even if there were some conceivable such justification, the scheme is and was broader than necessary to achieve such a purpose.

125.     As a direct and proximate result of Endo and Teikoku's concerted conduct, as alleged herein, Plaintiff and the Class were harmed.

126.     By engaging in the foregoing conduct, Endo and Teikoku intentionally and wrongfully engaged in a conspiracy to monopolize the relevant market in violation of the following state laws:

    a.     Arizona Rev. Stat. §§ 44-1402, *et seq.*, with respect to purchases in Arizona by members of the Class.

    b.     Cal. Bus. Code §§ 16700, *et seq.*, and Cal. Bus. Code §§ 17200, *et seq.*, with respect to purchases in California by members of the Class.

    c.     D.C. Code Ann. §§ 28-4503, *et seq.*, with respect to purchases in the District of Columbia by members of the Class.

    d.     Fla. Stat. §§ 501.201, *et seq.*, with respect to purchases in Florida by members of the Class.

e.      740 Ill. Comp. Stat. 10/3, *et seq.*, with respect to purchases in Illinois by members of the Class.

f.      Iowa Code § 553.3 *et seq.*, with respect to purchases of Lidoderm and AB-rated generic equivalents in Iowa by members of the Class.

g.      Kan. Stat. Ann. §§ 50-101, *et seq.*, with respect to purchases in Kansas by members of the Class.

h.      Mass. Gen. L. Ch. 93A, *et seq.*, with respect to purchases in Massachusetts by members of the Class, with thousands of Massachusetts consumers paying substantially higher prices for Lidoderm and its generic equivalents in actions and transactions occurring substantially within Massachusetts.

i.      Me. Rev. Stat. Ann. 10, § 1101, *et seq.*, with respect to purchases in Maine by members of the Class.

j.      Mich. Comp. Laws Ann. §§ 445.772, *et seq.*, with respect to purchases in Michigan by members of the Class.

k.      Minn. Stat. §§ 325D.49, *et seq.*, with respect to purchases in Minnesota by members of the Class.

l.      Miss. Code Ann. §§ 75-21-3, *et seq.*, with respect to purchases in Mississippi by members of the Class.

m.      Neb. Code Ann. §§ 59-802, *et seq.*, with respect to purchases in Nebraska by members of the Class.

n.      Nev. Rev. Stat. Ann. § 598A.060, *et seq.*, with respect to purchases in Nevada by members of the Class, in that thousands of sales of Lidoderm took place at Nevada

pharmacies, purchased by Nevada consumers at supracompetitive prices caused by Defendants' conduct.

o.      N.M. Stat. Ann. §§ 57-1-2, *et seq.*, with respect to purchases in New Mexico by members of the Class.

p.      New York General Business Law § 340, *et seq.*, with respect to purchases in New York by members of the Class.

q.      N.C. Gen. Stat. §§ 75-2.1, *et seq.*, with respect to purchases in North Carolina by members of the Class.

r.      N.D. Cent. Code § 51-08.1-02, *et seq.*, with respect to purchases in North Dakota by members of the Class.

s.      Or. Rev. Stat. §§ 646.705, *et seq.*, with respect to purchases in Oregon by members of the Class.

t.      Pa. Stat. Ann. §§ 201–1, et seq., with respect to purchases in Pennsylvania by members of the Class.

u.      10 L.P.R.A. § 251, *et seq.*, with respect to purchases in Puerto Rico by members of the Class.

v.      R.I. Gen. Laws §§ 6-36-7 *et seq.*, with respect to purchases in Rhode Island by members of the Class.

w.      S.D. Codified Laws Ann. § 37-1-3.2, *et seq.*, with respect to purchases in South Dakota by members of the Class.

x.      Utah Code Ann. §§ 76-10-911, *et seq.*, with respect to purchases in Utah by members of the Class.

y.      Tenn. Code Ann. §§ 47-25-101, *et seq.*, with respect to purchases in

Tennessee by members of the Class, in that the actions and transactions alleged herein substantially affected Tennessee, with thousands of consumers in Tennessee paying substantially higher prices for Lidoderm and AB-rated generic equivalents at Tennessee pharmacies.

z.      Vt. Stat. Ann. 9, § 2453, *et seq.*, with respect to purchases in Vermont by members of the Class.

aa.     W.Va. Code §§ 47-18-3, *et seq.*, with respect to purchases in West Virginia by members of the Class.

bb.     Wis. Stat. § 133.03, *et seq.*, with respect to purchases of Lidoderm and AB-rated generic equivalents in Wisconsin by members of the Class, in that the actions and transactions alleged herein substantially affected the people of Wisconsin, with thousands of consumers in Wisconsin paying substantially higher price for Lidoderm at Wisconsin pharmacies.

## CLAIM III: CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAW
### (Asserted against All Defendants)

127.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

128.    This claim is pled as to all Defendants.

129.    In or about May 2012 and at times prior to the formal execution thereof Defendants entered into the Agreement, a continuing illegal contract, combination and conspiracy in restraint of trade under which Endo and Teikoku agreed to pay Watson substantial consideration in exchange for Watson's agreement to delay bringing its generic version of Lidoderm to the market, the purpose and effect of which were to: (a) allocate 100% of the market for lidocaine patch 5% in the United States to Endo and Teikoku; (b) prevent the sale of generic versions of Lidoderm in the United States, thereby protecting Lidoderm from any generic

competition for over a year; (c) delay the entry of an authorized generic by Endo and Teikoku until 7.5 months after Watson's entry with a generic Lidoderm product; (d) fix, at supracompetitive levels, the price at which consumers would pay for lidocaine patch 5%; and (e) create a bottleneck to prevent FDA from approving any other ANDA for generic Lidoderm until after Watson's exclusivity period ends.

130.    The Agreement harmed Plaintiff and the Class as set forth above.

131.    The Agreement covered a sufficiently substantial percentage of the relevant market to harm competition.

132.    There is and was no legitimate, nonpretextual, procompetitive justification for the payment from Endo and Teikoku to Watson that outweighs its harmful effect. Even if there were some conceivable such justification, the payment was not necessary to achieve such a purpose.

133.    As a direct and proximate result of Defendants' anticompetitive conduct, as alleged herein, Plaintiff and the Class were harmed as aforesaid.

134.    By engaging in the foregoing conduct, Defendants entered a conspiracy and combination in restraint of trade in violation of the following state laws:

    a.      Arizona Rev. Stat. §§ 44-102, *et. seq.*, with respect to purchases in Arizona by members of the class.

    b.      Cal. Bus. Code §§ 16700, *et seq.*, and Cal. Bus. Code §§ 17200, *et seq.*, with respect to purchases in California by members of the Class.

    c.      D.C. Code Ann. §§ 28-4503, *et seq.*, with respect to purchases in the District of Columbia by members of the Class.

    d.      Fla. Stat. §§ 501.201, *et seq.*, with respect to purchases in Florida by members of the Class.

e.      740 Ill. Comp. Stat. 10/3, *et seq.*, with respect to purchases in Illinois by members of the Class.

f.      Iowa Code § 553.3 *et seq.*, with respect to purchases of Lidoderm and AB-rated generic equivalents in Iowa by members of the Class.

g.      Kan. Stat. Ann. §§ 50-101, *et seq.*, with respect to purchases in Kansas by member of the Class.

h.      Mass. Gen. L. Ch. 93A, *et seq.*, with respect to purchases in Massachusetts by members of the Class, with thousands of Massachusetts consumers paying substantially higher prices for Lidoderm and its generic equivalents in actions and transactions occurring substantially within Massachusetts.

i.      Me. Rev. Stat. Ann. 10, § 1101, *et seq.*, with respect to purchases in Maine by members of the Class.

j.      Mich. Comp. Laws Ann. §§ 445.772, *et seq.*, with respect to purchases in Michigan by members of the Class.

k.      Minn. Stat. §§ 325D.49, *et seq.*, with respect to purchases in Minnesota by members of the Class.

l.      Miss. Code Ann. §§ 75-21-3, *et seq.*, with respect to purchases in Mississippi by members of the Class.

m.      Neb. Code Ann. §§ 59-802, *et seq.*, with respect to purchases in Nebraska by members of the Class.

n.      Nev. Rev. Stat. Ann. § 598A.060, *et seq.*, with respect to purchases in Nevada by members of the Class, in that thousands of sales of Lidoderm took place at Nevada

pharmacies, purchased by Nevada consumers at supracompetitive prices caused by Defendants' conduct.

        o.      N.M. Stat. Ann. §§ 57-1-2, *et seq.*, with respect to purchases in New Mexico by members of the Class.

        p.      New York General Business Law § 340, *et seq.*, with respect to purchases in New York by members of the Class.

        q.      N.C. Gen. Stat. §§ 75-2.1, *et seq.*, with respect to purchases in North Carolina by members of the Class.

        r.      Or. Rev. Stat. §§ 646.705, *et seq.*, with respect to purchases in Oregon by members of the Class.

        s.      10 L.P.R.A. § 251, *et seq.*, with respect to purchases in Puerto Rico by members of the Class.

        t.      R.I. Gen. Laws §§ 6-36-7 *et seq.*, with respect to purchases in Rhode Island by members of the Class.

        u.      S.D. Codified Laws Ann. § 37-1-3.2, *et seq.*, with respect to purchases in South Dakota by members of the Class.

        v.      Utah Code Ann. §§ 76-10-911, *et seq.*, with respect to purchases in Utah by members of the Class.

        w.      Tenn. Code Ann. §§ 47-25-101, *et seq.*, with respect to purchases in Tennessee by members of the Class, in that the actions and transactions alleged herein substantially affected Tennessee, with thousands of consumers in Tennessee paying substantially higher prices for Lidoderm and AB-rated generic equivalents at Tennessee pharmacies.

x.   Vt. Stat. Ann. 9, § 2453, *et seq.*, with respect to purchases in Vermont by members o the Class.

y.   W.Va. Code §§ 47-18-3, *et seq.*, with respect to purchases in West Virginia by members of the Class.

z.   Wis. Stat. § 133.03, *et seq.*, with respect to purchases of Lidoderm and AB-rated generic equivalents in Wisconsin by members of the Class, in that the actions and transactions alleged herein substantially affected the people of Wisconsin, with thousands of consumers in Wisconsin paying substantially higher price for Lidoderm at Wisconsin pharmacies.

### CLAIM IV: ATTEMPTED MONOPOLIZATION UNDER STATE LAW
### (Asserted against Endo and Teikoku Defendants)

135.   Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

136.   This claim is pled as to Endo, Teikoku Seiyaku and Teikoku Pharma.

137.   Endo and Teikoku, through their overarching anticompetitive scheme, specifically intended to maintain monopoly power in the relevant market. It was Endo's and Teikoku's conscious objective to control prices and/or exclude competition in the relevant market.

138.   The natural and probable consequence of Endo and Teikoku's overarching anticompetitive scheme, which was intended by, and plainly foreseeable to, Endo and Teikoku, was to control prices and exclude competition in the relevant market, to the extent it did not succeed.

139.   There was a substantial and real chance, a reasonable likelihood, and/or a dangerous probability that Endo and Teikoku would succeed in and achieve their goal of maintaining monopoly power in the relevant market.

140.   As a direct and proximate result of Endo and Teikoku's illegal and monopolistic

conduct, Plaintiff and the Class were harmed.

141.     By engaging in the foregoing conduct, Endo and Teikoku have intentionally and wrongfully attempted to monopolize the relevant market in violation of the following state laws:

a.     Arizona Rev. Stat. §§ 44-1403, et seq., with respect to purchases in Arizona by members of the Class.

b.     Cal. Bus. & Prof. Code §§ 17200, et seq., and California common law with respect to purchases in California by members of the Class.

c.     D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia by members of the Class.

d.     Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida by members of the Class.

e.     740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois by members of the Class.

f.     Iowa Code § 553.5 et seq., with respect to purchases in Iowa by members of the Class.

g.     Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts by members of the Class, with thousands of Massachusetts consumers paying substantially higher prices for Lidoderm and its generic equivalents in actions and transactions occurring substantially within Massachusetts.

h.     Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine by members of the Class.

i.     Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan by members of the Class.

45

    j.  Minn. Stat. §§ 325D.49, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota by members of the Class.

    k.  Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi by members of the Class.

    l.  Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska by members of the Class.

    m.  Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada by members of the Class.

    n.  N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico by members of the Class.

    o.  N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina by members of the Class.

    p.  N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota by members of the Class.

    q.  Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon by members of the Class.

    r.  10 L.P.R.A. § 260, et seq., with respect to purchases in Puerto Rico by members of the Class.

    s.  R.I. Gen. Laws §§ 6-36-5 et seq., with respect to purchases in Rhode Island by members of the Class.

    t.  S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota by members of the Class.

u.      Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah by members of the Class.

v.      Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont by members of the Class.

w.      W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia by members of the Class.

x.      Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin by members of the Class.

## CLAIM V: UNJUST ENRICHMENT
### (Asserted against All Defendants)

142.    Plaintiff hereby incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

143.    Defendants have benefited from the overcharges on their sales of Lidoderm resulting from the unlawful and inequitable acts alleged in this Complaint.

145.    Defendants' financial benefits resulting from their unlawful and inequitable conduct are traceable to overpayments for Lidoderm by Plaintiff and members of the Class.

146.    Plaintiff and the Class have conferred upon Defendants an economic benefit, in the nature of profits resulting from unlawful overcharges, to the economic detriment of Plaintiff and the Class.

147.    It would be futile for Plaintiff and the Class to seek a remedy from any party with whom they had privity of contract. Defendants have paid no consideration to anyone for any benefits received indirectly from Plaintiff and the Class.

148.    It would be futile for Plaintiff and the Class to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly

purchased Lidoderm, because those intermediaries are not liable and would not compensate Plaintiff and the Class for Defendants' unlawful conduct or the harm caused to Plaintiff and the Class by that unlawful conduct.

149.    The economic benefit that Defendants derived by charging supracompetitive and artificially inflated prices for Lidoderm is a direct and proximate result of Defendants' unlawful practices.

150.    The financial benefits that Defendants derived rightfully belong to Plaintiff and the Class, because Plaintiff and the Class paid anticompetitive prices during the Class Period, inuring to the benefit of Defendants.

151.    It would be inequitable under unjust enrichment principles under the laws of each of the States in the United States except Ohio and Indiana, and under the laws of the District of Columbia and Puerto Rico for the Defendants to be permitted to retain any of the overcharges for Lidoderm derived from Defendants' unlawful conduct alleged in this Complaint.

152.    Defendants are aware of and appreciate the benefits bestowed upon them by Plaintiff and the Class.

153.    Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiff and the Class all unlawful or inequitable proceeds received by Defendants.

154.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants traceable to Plaintiff and the Class.

155.    Plaintiff and the Class have no adequate remedy at law.

**CLAIM VI: DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR DEFENDANTS' VIOLATIONS OF SECTION 1 AND SECTION 2 OF THE SHERMAN ACT**
**(Asserted against All Defendants)**

156.    Plaintiff hereby incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

157.    Plaintiff's allegations comprise violations of Sections 1 and 2 of the Sherman Act, in addition to the state laws alleged.

158.    Plaintiff and the Class, pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) hereby seek a declaratory judgment that Defendants' conduct in seeking to prevent competition as described herein violates Sections 1 and 2 of the Sherman Act.

159.    Plaintiff and the Class further seek equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Defendants' unlawful conduct, and other relief so as to assure that similar anticompetitive conduct does not reoccur in the future.

## XII.    DEMAND FOR JUDGMENT

WHEREFORE, Plaintiff, on behalf of herself and the Class, respectfully requests that the Court:

A.    Determine that this action may be maintained as a class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2) and (b)(3), and direct that reasonable notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to the Class, and declare the Plaintiff as the representative of the Class;

B.    Declare that the conduct alleged herein is in violation of the statutes set forth above;

C.    Enjoin Defendants from continuing the illegal activities alleged herein and grant other equitable and injunctive relief as necessary to mitigate or prevent future anticompetitive

effects of Defendants' conduct;

      D.    Enter joint and several judgments against Defendants and in favor of Plaintiff and the Class;

      E. Award the Class damages and, where applicable, treble, multiple and/or other damages, in an amount to be determined at trial, including interest;

      F.    Grant Plaintiff and the Class equitable relief in the nature of disgorgement, restitution, and the creation of a constructive trust to remedy Defendants' unjust enrichment; and

      G.    Award Plaintiff and the Class their costs of suit, including reasonable attorneys' fees as provided by law.

## XIII.  JURY DEMAND

      Pursuant to Federal Rule of Civil Procedure 38, Plaintiff, on behalf of herself and the proposed Class, demands a trial by jury on all issues so triable.

                           Respectfully submitted,

                           _____

                           Robert Sink, Esquire
                           LAW OFFICES OF ROBERT W. SINK
                           1800 J.F.K. Boulevard, 14th Floor
                           Philadelphia, PA 19103
                           Tel:  (215) 995-1000

                           ***Attorney for Plaintiff,***
                           ***Irene Kampanis,***
                           ***On behalf of herself and***
                           ***All others similarly situated.***